**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**MMR CORPORATION (LA) and James B. Rutland, Defendants–Appellants.**

**No. 89–3526.**

United States Court of Appeals,
Fifth Circuit.

July 23, 1990.

Michael D. Hunt, Phelps, Dunbar, Marks, Claverie & Sims, Baton Rouge, La., Luther T. Munford, Phelps, Dunbar, Marks, Claverie & Sims, Jackson, Miss., Frederick T. Davis, Patterson, Belknap, Webb & Tyler, New York City, for MMR Corp.

Donald L. Beckner, Bryan M. White, Baton Rouge, La., John R. Martzell, Martzell, Thomas & Hickford, New Orleans, La., for James B. Rutland.

Andrea Limmer, Asst. Chief, John J. Powers, III, Appellate Section, Dept. of Justice, Washington, D.C., John P. Volz, U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before THORNBERRY, GEE, and HIGGINBOTHAM Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

MMR Corporation (LA) and, its president, James B. "Pepper" Rutland, appeal their convictions for conspiracy to rig bids on a Cajun Electric Power Cooperative project in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and for defrauding Cajun Electric on the same project in violation of the mail fraud statute, 18 U.S.C. § 1341. The indictment also charged defendants with aiding and abetting these crimes contrary to 18 U.S.C. § 2.

Defendants attack the convictions on numerous grounds. First, they argue that MMR was not a competitor of the charged co-conspirators and therefore cannot be guilty of a per se violation of the Sherman Act. They next complain of rulings on questions of evidence, comments by the prosecutor and the sufficiency of the evidence. We reject each of these arguments and others that we will describe and affirm both convictions.

I.

In the late 1970's Cajun Electric, a non-profit electrical generation and transmission cooperative, decided to construct an electrical generating plant, Big Cajun No. 2 Power Station, at a New Roads, Louisiana site. The power plant was to have three units. The Big Cajun project was sponsored by the Rural Electrification Administration of the United States Department of Agriculture. MMR did not bid on Units 1 and 2 but participated as a joint venturer with Lord Electric Company on the power electrical contracts, primarily by supervising local labor.

In 1979, after construction of Units 1 and 2 was underway, Cajun Electric decided to solicit bids for the construction of Unit 3. Although MMR had never handled a large power electrical project on its own at the time, MMR lobbied Cajun Electric engineers to get on the bid list. Up until this time MMR had primarily been a specialty contractor. Its principal experience and expertise was in instrumentation work, which involves installing and testing the instruments that measure temperature, pressure, flow, and various processes in power plants and other industrial facilities. Because MMR had established a relationship with Cajun Electric, it believed its chances of successfully bidding on Unit 3 were good.

In September 1980 Cajun Electric, through its engineers, prepared a list of seven companies, including MMR, that had demonstrated the financial and technical capability to perform the electrical portion of Unit 3. Six of the invited bidders, including MMR, took out plans and specifications for the project on November 14, 1980, and sent representatives to a pre-bid meeting with Cajun Electric engineers on December 16, 1980. On January 16, 1981, two months later, four of the six companies submitted bids: Fischbach and Moore, Inc., Lord, The Howard P. Foley Company, and Hatzel & Buehler, Inc. MMR did not submit a bid. Fischbach was the low bidder and was awarded the contract on February 23, 1981, for $21.3 million. MMR received a $4.3 million subcontract from Fischbach.

The conspiracy which formed the basis for the convictions of MMR and Rutland had its beginnings at least as early as March 1980 when Paul Murphy, a Regional Vice-President of Fischbach, met with other representatives of the nation's largest electrical contractors. This was nothing new. These companies had been, for several years, rigging bids for large projects throughout the country. At this meeting they began the process of allocating upcoming electrical projects. Murphy ex-

pressed interest in Unit 3. In mid-December 1980, Fischbach's President, Alfred Manville, told Murphy that he had spoken to other potential bidders on the project and that they had agreed to rig the job in favor of Fischbach if Fischbach could get the one remaining bidder, MMR, to go along.

Murphy then called Rutland to arrange a meeting. Murphy had known Rutland for some time and had recently been negotiating with Rutland and Robert McCracken, Chairman of MMR, to acquire MMR for Fischbach. Murphy, J.R. Sturgill, another Fischbach official, Rutland, and McCracken were present at this meeting, held on December 19, 1980, at the City Club in Baton Rouge, Louisiana. They first discussed MMR's outstanding obligations on three earlier projects rigged by MMR and Fischbach—Borden Chemical Company, Freeport Uraniam Recovery Company, and Strategic Petroleum Reserve. Rutland's notes from the meeting referred to the Borden and Freeport "agreement[s]" being "cleared" and to MMR owing Fischbach $250,000 on the SPR "agreement." Murphy then told Rutland and McCracken that the other bidders had agreed to rig the job in favor of Fischbach if MMR would support Fischbach. In response Rutland indicated his strong belief that MMR, though it was a much smaller company and though it had never performed a large electrical contracting job alone, could do the work and proposed a joint venture. Murphy would not agree to a joint venture.

Rutland went to the men's room and Murphy followed. According to Murphy, he and Rutland worked out a deal in the men's room that MMR would get an instrumentation subcontract with a mark-up proportional to Fischbach's mark-up on the rigged project. When they returned they told Sturgill and McCracken that they had struck a deal. Murphy, however, did not testify to MMR's specific obligations under the agreement although it was clear from his testimony that he believed Rutland agreed that MMR would not compete but instead cooperate with Fischbach. Rutland's notes of the discussion of Unit 3 refer to bidding the job as a joint venture and to MMR having the "option" of subcontracting.

Murphy testified that MMR agreed to prepare a legitimate cost estimate so that Fischbach could compare its estimate to be sure that Fischbach's estimators had not made any mistakes. On January 14, 1981, two days before bids were due, Rutland brought his chief estimator to Fischbach's offices. While Rutland met with Sturgill and Murphy, MMR's and Fischbach's estimators met.

At the January 14 meeting Murphy had a telephone conversation with Pete Matthews of Lord about what number MMR should bid. They decided that MMR should be the high bidder, primarily because if MMR's bid was close to Fischbach's, MMR might get the job because of its good relationship with Cajun Electric. Murphy told Rutland and McCracken what number he wanted MMR to bid. Rutland was embarrassed to submit the number suggested by Murphy because it was much greater than MMR's estimated bid. Rutland feared that submitting such a bid would ruin MMR's image with Cajun Electric. Murphy testified that at the end of the meeting he still believed that MMR, although unhappy about it, was going to submit the high bid.

According to Sturgill, he and Murphy discussed the idea of MMR not submitting a bid at all, and Murphy later told him that MMR agreed to not submit a bid. Murphy, however, testified that he did not know that MMR would not bid until after the bid date. Either after the meeting or the next day, Rutland informed Cajun Electric by phone that MMR would not be submitting a bid. Rutland wrote a letter to the President of Cajun Electric confirming that MMR had decided not to bid the job, but to seek work as a subcontractor. Meanwhile, Fischbach padded its costs, raised its mark-up from $3.5 to $6 million, and was awarded the contract for $21.3 million. Sturgill and Rutland then worked out the terms of MMR's subcontract.

According to Sturgill, he and Rutland agreed that MMR would get $2,853,487 for its costs plus a $1,500,000 fee for a total of

$4,353,487. Fischbach, however, was required to report all subcontracts to Cajun Electric and the REA. Because the mark-up on the MMR subcontract was 60%, Sturgill was concerned that the subcontract amount would appear too high to Cajun Electric and the REA. Thus, Sturgill and Rutland agreed that the written subcontract would be for $3,353,487, but that an additional $1 million would be paid to MMR pursuant to a change order purporting to reflect additional work. Change orders were not seen by Cajun Electric or the REA. A handwritten note on MMR memo paper initialed by Sturgill and Rutland confirmed Sturgill's testimony. The subcontract that went to REA in August 1981 showed a price of $3,353,487. In November 1981 the change order was executed by Sturgill.

A bid on Unit 3 required a bid bond or a certified check in the amount of 10% of the bid. A bidder unable to obtain a performance bond would forfeit the bid bond or check. Cajun Electric and MMR initially estimated the job to cost approximately $11 million, about the same cost as Units 1 and 2 together and within MMR's bonding capacity. At the January 14 meeting Murphy, Sturgill, McCracken, and Rutland agreed that the project cost was actually around $17 million. Cajun Electric engineers later concluded that the actual cost of the project was at least $18.6 million. There was testimony that both of these figures exceeded the limits of MMR's bonding capacity, effectively precluding MMR from bidding on Unit 3,[1] although it is unclear whether MMR officials were aware that they probably could not obtain bonding before the pivotal December 19 meeting.

Count I of the indictment charged Rutland and MMR with joining and aiding and abetting a conspiracy to rig bids on the Cajun Electric project in violation of the Sherman Act, 15 U.S.C. § 1, and 18 U.S.C. § 2. Counts II, III, and IV alleged the same facts and charged Rutland and MMR with joining and aiding and abetting a scheme to defraud Cajun Electric in violation of the mail fraud statute, 18 U.S.C. § 1341, and 18 U.S.C. § 2. The jury convicted MMR and Rutland on all counts. McCracken was also charged, but he was acquitted on all counts. The district court fined MMR $1,000,000 on the antitrust count and $1,000 each on the mail fraud counts. The court sentenced Rutland to six months imprisonment and fined him $103,000.

## II.

The indictment charged in count I that Rutland and MMR "joined and participated in a ... conspiracy to rig bids for the award and performance of [Big Cajun Unit 3]." The indictment described the conspiracy as an agreement that "MMR ... would submit collusive, noncompetitive and rigged bids ... or would not submit bids." The indictment further asserted in a section entitled "Means and Method of the Conspiracy" that MMR agreed at the December 19 meeting not to compete but instead to "submit a high, complimentary bid to support Fischbach's bid" in exchange for a "lucrative subcontract ..., the precise terms of which would be negotiated later." The indictment also alleged that Sturgill told Rutland that MMR could "fulfill its agreement not to compete ... by not submitting a bid for the contract."[2]

Rutland and MMR argue that the indictment alleges two agreements—an initial agreement to submit a high bid and a second agreement to not submit a bid at all and that there is insufficient evidence that they joined the conspiracy. At least one

---

**1.** Theoretically, MMR could have bid even if it could not get a bid bond by submitting a certified check, but because MMR would have forfeited the bid check if its bid was accepted and it was unable to obtain a performance bond, this was not realistic.

**2.** Rutland and MMR note that the evidence at trial did not show that Sturgill told Rutland that MMR could fulfill its agreement not to compete by not submitting a bid. Sturgill testified that he and Murphy discussed MMR not submitting a bid and that Murphy told him that MMR had agreed to not submit a bid. Rutland and MMR, however, do not, and could not on this record, contend that this was a material variance between the indictment and the proof at trial.

variation of defendant's argument of insufficient evidence rests on its assertion that because the indictment states that MMR agreed to submit a high bid at the December 19 meeting and later to not submit a bid, the government was required to prove beyond a reasonable doubt that Rutland and MMR explicitly agreed to do these particular acts.

We are not persuaded. First, the indictment does not allege two agreements. It alleges a conspiracy to rig bids joined by MMR. It describes MMR's initial obligation under that agreement to be the submitting of a high, complimentary bid and it asserts that the parties later agreed that MMR could fulfill its agreement by not submitting a bid. But it alleges only one agreement. Thus, defendants' argument boils down to a complaint that the government failed to prove MMR's precise obligations under the agreement—whether MMR was obliged to submit a high bid or to not submit a bid at all.

■ The government, however, is not required to prove a formal, express agreement with all the terms precisely set out and clearly understood by the conspirators. *See American Tobacco Co. v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1138–39, 90 L.Ed. 1575 (1946); *United States v. General Motors Corp.*, 384 U.S. 127, 143, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966); *Gainesville Util. v. Florida Power & Light Co.*, 573 F.2d 292, 301 (5th Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978). It is enough that the government shows that the defendants accepted an invitation to join in a conspiracy whose object was unlawfully restraining trade. *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939) (stating that the "[a]cceptance ... of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish unlawful conspiracy under the Sherman Act"). Therefore, our question is simply whether there is sufficient evidence that Rutland and MMR accepted the invitation to join the bid-rigging conspiracy.

■ Viewing the evidence in the light most favorable to the government, as we must, we conclude that there was ample evidence to allow a reasonable jury to conclude that Rutland and MMR agreed to join the conspiracy to rig bids on Unit 3. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Mejia*, 844 F.2d 209, 211–12 (5th Cir.1988). The evidence shows that Sturgill and Murphy asked Rutland and MMR to join the conspiracy to rig bids on Unit 3 and that, although initially there was resistance, eventually a deal was struck between Murphy and Rutland in the men's room that MMR, in exchange for a lucrative subcontract, would become part of the conspiracy. The evidence also shows that MMR in fact received a lucrative subcontract, providing substantial circumstantial support for the existence of an agreement.

### III.

As another variation of their sufficiency argument, the defendants complain that certain testimony by Murphy and Sturgill should not have been admitted because Murphy and Sturgill lacked personal knowledge. In particular, defendants point to Murphy's testimony of his understanding at the end of the January 14 meeting that, while Rutland was unhappy about it, MMR would submit the high bid, and Sturgill's testimony that it was his understanding that, in exchange for a lucrative subcontract, MMR would cooperate with Fischbach in rigging bids on Unit 3. The defendants also challenge testimony of Murphy and Sturgill to the Borden, Freeport, and SPR bid-rigging agreements.

■ Murphy's testimony about the bid-rigging agreement with Fischbach was admissible. Murphy was a direct party to the agreement with Rutland with personal knowledge of the facts underlying his testimony. Further, Murphy's inferences were rationally based on his perception and helpful to the jury. The defendants complain that Murphy did not testify to the factual basis for the inference he drew. In some

special situations it may be necessary to require the lay witness to be able to testify to the factual basis for his or her opinion or inference. *See United States v. Phillips*, 600 F.2d 535, 538–39 (5th Cir.1979) (stating that where a witness is testifying that the defendant possesses the requisite criminal intent we might require the witness, as a prerequisite to admissibility under Rule 701, to articulate the factual basis for his or her opinion). The general rule, however, is that the lay witness need not be able to testify to the factual basis for his or her opinion. *United States v. Carlock*, 806 F.2d 535, 552 (5th Cir.1986), *cert. denied*, 480 U.S. 949, 107 S.Ct. 1611, 94 L.Ed.2d 796 (1987). We are not persuaded that a departure from the general rule was warranted in this case. Murphy was a direct participant. He was a negotiator of the terms of joinder of the conspiracy. Allowing him to testify about his understanding or that an agreement was reached is not beyond the trial court's discretion.

■ Sturgill's testimony about the agreement between MMR and Fischbach is more troubling. Nonetheless, we are persuaded that there was sufficient evidence to support a finding that Sturgill's testimony about the agreement between MMR and Fischbach was based on personal knowledge. We acknowledge that it was Murphy who negotiated the agreement and that Sturgill did testify that he was unsure how he had come to know about the agreement between Murphy and Rutland. But Sturgill had significant contact with Rutland. He was present at both meetings between Fischbach and MMR concerning Big Cajun and negotiated MMR's subcontract. This circumstantial evidence supports a finding that Sturgill had personal knowledge.

We next turn to whether Murphy and Sturgill were competent to testify that the Borden, Freeport, and SPR jobs were rigged. Sturgill was the district manager in New Orleans with supervisory responsibility for the bids from that office. Moreover, Sturgill's trial testimony disclosed extensive knowledge of these jobs. Nor is it insignificant that Sturgill was privy to discussions about the bid-rigging agreements at the City Club meeting including an argument between McCracken and Murphy over the SPR job and the amount due Fischbach, MMR's "silent" partner in that job.

## IV.

■ Rutland and MMR next argue that the district court erred in not giving a specific instruction requiring the jury to find unanimously either that they agreed to submit a high bid or that they agreed not to bid at all. *See United States v. Gipson*, 553 F.2d 453 (5th Cir.1977). The government asserts that the defendants did not properly preserve an objection to the court's unanimity charge, requiring us to review this claim under the plain error standard. We need not pause to explore the standard of review. Assuming defendants are favored, the district court properly refused a specific unanimity instruction. As we explained, we read the indictment to charge only one agreement and are persuaded that the government need not have proved MMR's precise obligations under that agreement; it needed to prove only that MMR agreed to join the bid-rigging conspiracy. A high bid or no bid on the facts of this case, were means of implementing the charged conspiracy. We are not persuaded that bidding high or backing away from bidding are conceptually distinct means of carrying out an agreement to rig bids. In any event, the usual unanimity instruction is sufficient unless "... a genuine possibility of juror confusion exists." *United States v. Phillips*, 869 F.2d 1361, 1366 (10th Cir.1988); *see also United States v. Gipson*, 553 F.2d 453 (5th Cir. 1977). We find none.

## V.

■ Defendants challenge the district court's decision to apply per se liability rules. Defendants maintain that even if, as we have found, there was sufficient evidence that they agreed to join the conspiracy to rig bids on Unit 3, this was not a per se case because MMR was not an actual or potential competitor of Fischbach and the other conspirators. They argue that

the evidence shows that MMR could not compete with Fischbach or the other conspirators on Big Cajun Unit 3 because the job greatly exceeded MMR's bonding capacity, precluding it from successfully bidding for the project. They contend that their evidence of lack of bonding capacity compels a finding that MMR was not a competitor of the other conspirators as a matter of law. In the alternative, they argue that the district court erred in refusing to instruct the jury that before it could convict, it must find that MMR was a competitor for the Big Cajun job.

In making this argument the defendants point to various cases which state the unassailable proposition that an agreement among competitors to fix prices is a per se violation of section 1 of the Sherman Act. *See, e.g., United States v. Korfant,* 771 F.2d 660, 663 (2d Cir.1985); *United States v. Consolidated Packaging Corp.,* 575 F.2d 117, 125 (7th Cir.1978); *United States v. Koppers Co.,* 652 F.2d 290, 293 (2d Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981); *United States v. Brighton Bldg. & Maintenance Co.,* 598 F.2d 1101 (7th Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979). The defendants, however, rely most heavily on two double jeopardy cases in which defendants challenged a second Sherman Act conspiracy prosecution for bid-rigging. *United States v. Sargent Elec. Co.,* 785 F.2d 1123, 1127 (3d Cir.), *cert. denied,* 479 U.S. 819, 107 S.Ct. 82, 93 L.Ed.2d 36 (1986); *United States v. Ashland–Warren, Inc.,* 537 F.Supp. 433, 443 (M.D.Tenn.1982). The courts held that the defendants engaged in multiple conspiracies and that the second conspiracy prosecution did not violate the double jeopardy clause because the parties to the conspiracy which formed the basis for the first conviction were not competitors of the parties to the second charged conspiracy.

In *Ashland–Warren* the defendant argued that its trial on bid-rigging charges in Tennessee was barred by its earlier conviction for rigging highway paving jobs in Eastern Virginia. The defendant maintained that the two indictments related to a single interstate agreement with the same membership and objectives. The court found, however, that factually there had to be two conspiracies because, with the exception of the defendant, who was capable of competing for jobs in Virginia and Tennessee, the conspirators were only capable of competing in either Tennessee or Virginia but not both. This was because hot asphalt can only be hauled a relatively short distance and only the defendant had a plant in both states. *Id.* The court ruled that because the defendant conspired with a completely different group of competitors in Eastern Virginia, the second prosecution for bid-rigging in Tennessee was not barred by the double jeopardy clause. *Id.* at 445. The court based its ruling on the logic of the per se rule: "Price-fixing is banned because of its actual or potential threat to the 'central nervous system of the economy.' Bidrigging poses such a threat only when its participants would otherwise be competitors. Unless the offending group consists of competitors, a bid-rigging scheme lacks any utility." *Id.* at 445 (citations omitted).

The Third Circuit arrived at the same result in *Sargent Electric Co.* The court read section 1 of the Sherman Act to require that "[t]he illegal object of the conspiracy ... be identified in terms of an intended or achieved effect upon commerce in a relevant market." 785 F.2d at 1127. The court noted that the bid-rigging conspiracy in that case was per se illegal and that no inquiry into the competitive effect of the conspiracy was necessary. *Id.* The court, however, concluded that an agreement among persons who are not actual or potential competitors in a relevant market "is meaningless for Sherman Act purposes." *Id.* The court went on to hold that the relevant market for the bid-rigging between the electrical contractor defendants in that case was governed by the bid list for each project, which was not controlled by the conspirators, but by the officials in charge of each project. Based largely on this fact, the court concluded that, as a matter of law, the bid-rigging on the various projects constituted multiple conspiracies. *Id.* at 1131.

498

The defendants also rely on our opinion in *Transource International, Inc. v. Trinity Indus., Inc.*, 725 F.2d 274 (5th Cir.1984). In *Transource* we affirmed summary judgment dismissing antitrust claims arising out of a joint venture relationship between Transource and Trinity. Transource had agreed not to compete with Trinity in the marketing or manufacturing of railcars. When the deal went sour Transource sued Trinity, contending that the agreement was illegal per se. We held that "the district court correctly concluded that Transource and Trinity were not horizontal competitors at the time of the contract" because "Transource's business at this time was the sale of distribution services while Trinity's was manufacturing railcars." *Id.* at 280. We also found that the two companies were not potential competitors because "Transource lacked the financial ability to enter the market at the same level as Trinity and could not have been considered a potential competitor." *Id.*

*Sargent, Ashland–Warren,* and *Transource* stand for the unremarkable proposition that an agreement not to compete between two parties who are not actual or potential competitors is not per se or otherwise illegal because an agreement not to compete between two parties who are not competitors is meaningless. However, even if MMR is deemed not to be an actual or potential competitor of Fischbach and the other companies, the conspiracy was not a meaningless conspiracy between noncompetitors since Fischbach, Lord, and Foley were competitors.

First, a noncompetitor can join a Sherman Act bid-rigging conspiracy among competitors. If there is a horizontal agreement between A and B, there is no reason why others joining that conspiracy must be competitors. Obviously, Rutland is not a competitor. He was a representative of a competitor. Second, the facts of this case illustrate how a company, although arguably unable in fact to carry out its competitive threat, which we will assume, can nonetheless further a conspiracy among competitors. Fischbach was not able to submit an inflated bid with the confidence that it would have no real competition for the project until Fischbach obtained assurance that MMR would not compete. Fischbach feared MMR's relationship with Cajun Electric. The jury could conclude that MMR made sure that Fischbach knew of its relationship, an effort reinforced by Cajun Electric's inviting MMR to bid. The evidence is compelling that Rutland and MMR agreed to and assisted Fischbach in preparing its deceptive bid. In sum, we conclude that MMR's alleged inability to ultimately get the job because it lacked adequate bonding capacity does not afford Rutland and MMR a defense under section 1 of the Sherman Act both because MMR was a competitive threat and, in any event, they were properly convicted as an aider and abettor.

## VI.

■ Before trial the government asked the court to direct defense counsel not to argue that the defendants should be acquitted because Fischbach's winning bid was reasonable. *See United States v. Trenton Potteries*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927) (stating that the reasonableness of a fixed price is not relevant, for the only question is whether there was an agreement to fix the price). The court granted the government's motion two months before trial in a one line statement "excluding any argument or evidence that [Fischbach's bid] was 'fair' or 'reasonable.'" When the government attempted to introduce evidence that the Fischbach bid was unreasonable at trial, the defendants objected, pointing to the court's order.

■ In response the government unnecessarily confused a straightforward, if difficult of application, principle. The costs and profits of a bid are relevant to the question of whether there was an illegal agreement. If there was an agreement to rig it is no defense that the resulting costs and profit of the job were "reasonable." The government confused this idea with its explanation that its pre-trial motion was not an attempt to preclude evidence on the reasonableness of Fischbach's bid, but was

rather, to block any argument by defense counsel that the reasonableness of Fischbach's bid was a ground for acquittal. This comes close to a nonsensical suggestion that evidence is admissible but can't be argued, a point one defense counsel made at trial.

Facing this shift in ruling in the middle of trial, defendants requested a mistrial, arguing that they were entitled to have two months, the time period the court's ruling had been in effect, to prepare their evidence on this issue. The court eventually ruled that its prior order would stand, but construed that ruling as only precluding defendants from arguing that Fischbach's bid was reasonable as a ground for acquittal and as not precluding either side from introducing evidence that Fischbach's bid was reasonable on the issue of intent. Thus, the court came back to a defensible application of the principle, with no help from the government. But it did so only in trial. The question we have is then whether the correction of its earlier erroneous ruling in mid-trial came in time to avoid prejudice to the defendants. Defendants forcefully argue that the court precluded them from introducing evidence to rebut the government's evidence, but after carefully reviewing the record we are persuaded that the district court did not prohibit the defendants from offering their own evidence on this issue.

The government took the position throughout the pretrial proceedings that Fischbach's bid was unreasonable. Its intent to introduce evidence on this point was plain. Thus, its motion in limine, odd as it strikes us, sought only to eliminate any *argument* by the defendants that they could be acquitted because Fischbach's bid was reasonable. We have much doubt that the able defense counsel here believed the court's order was intended to preclude the government or the defense from introducing evidence regarding the reasonableness of Fischbach's bid.

Second, and of greater significance, even if the defendants reasonably relied on the letter of the court's original ruling, we are

not persuaded that the district court's tardy modification prejudiced the defendants. Defendants requested a mistrial, but they did not request a continuance and never explained to the district court what proof they might offer or how much time they needed. Although they asserted prejudice in general terms, their primary argument was that if the government was allowed to introduce evidence on the reasonableness of Fischbach's bid, they were *entitled* to the two months the ruling had been in effect. The defendants did not argue that they needed two months. Defendants had sixteen days to prepare rebuttal evidence yet submitted none. Although on appeal the defendants claim that they have substantial evidence to offer on this issue, their failure to offer an evidentiary challenge below suggests the contrary. We suggest no failure of counsel. To the contrary, we read the silence to reflect an absence of amunition, not an absence of able marksmen.

## VII.

Rutland and MMR contend that the letter Rutland sent to Cajun Electric on January 15 stating that MMR would not submit a bid raised the issue of withdrawal from the conspiracy and required the court to give their requested instruction to the jury, that the burden was on the government to prove they did not withdraw from the conspiracy.[3]

The law in this circuit is that the burden of proving withdrawal, an affirmative defense, is on the defendant. *See United States v. Killian*, 639 F.2d 206, 208–09 (5th Cir. Unit A), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); *see also United States v. Finestone*, 816 F.2d 583, 589 (11th Cir.), *cert. denied*, 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987); *United States v. Walker*, 796 F.2d 43, 49 (4th Cir.1986); *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir.1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). The defendants ask us to re-examine our decisions

3. The district court instructed the jury on withdrawal, but put the burden on the defendants.

in light of a Seventh Circuit case, *United States v. Read*, 658 F.2d 1225 (7th Cir. 1981), in which the court overruled prior circuit precedent placing the burden on the defendant. The *Read* court concluded that earlier panel decisions were based on a misinterpretation of *Hyde v. United States*, 225 U.S. 347, 369, 32 S.Ct. 793, 802, 56 L.Ed. 1114 (1912). The court then examined the defense of withdrawal, concluding that because "withdrawal negates the essential element of membership [in the conspiracy], it must be disproved beyond a reasonable doubt by the government." *Read*, 658 F.2d at 1236. The court, however, emphasized that the burden of going forward with the evidence is on the defendant. *Id.* at 1233; *see also United States v. Buckley*, 586 F.2d 498, 501 (5th Cir.1978) (stating that the defendant must provide "some evidence, but more than a scintilla" to be entitled to an instruction on an affirmative defense), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 242 (1979).

 This is all interesting but the defendants were not entitled to any withdrawal instruction because the issue was not sufficiently raised. To prove withdrawal the defendant must show "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *United States v. United States Gypsum Co.*, 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887–88, 57 L.Ed.2d 854 (1978). MMR's decision to not submit a bid was hardly inconsistent with the object of the conspiracy for the reasons we have earlier given.

### VIII.

 In his opening statement, counsel for Rutland told the jury to "please focus on the fact that Mr. Rutland is charged with what somebody else did.... The evidence is going to show that the only company charged in the Big Cajun job is MMR who did not bid. The evidence is going to show that the companies that did bid and did allegedly rig this were not charged." To rebut this statement the district court permitted the government to introduce evidence that unindicted co-conspirators Fischbach, Lord, and Foley had been charged with bid-rigging 19 times since 1983. The court did not permit the government to show the disposition of the charges.

The district court was persuaded that the evidence was relevant because it avoided "any inference that Fischbach ... had become a preferred client of the government." Defendants argue that the court should have only admitted the co-conspirators' plea agreements relating to the Big Cajun job, agreements stipulated to be admissible. Although the court offered defendants a limiting instruction at the time of its ruling, it ultimately gave none. Defendants requested no limiting instruction and made no objection, apparently choosing to leave the subject alone.

"This court has a 'long-established rule that a defendant's guilt may not be proven by showing that he associates with unsavory characters.'" *United States v. Romo*, 669 F.2d 285, 288 (5th Cir.1982) (citation omitted). We have emphasized that evidence that one associates with a criminal is not probative of a defendant's guilt and have condemned attempts by prosecutors to taint the defendant's character by such evidence. *Id.* We have applied this rule where the government has introduced or attempted to introduce evidence of the arrests, convictions, or other bad acts of the defendant's friends, relatives, or associates. *See United States v. Escamilla*, 666 F.2d 126 (5th Cir.1982); *United States v. Ochoa*, 609 F.2d 198 (5th Cir.1980); *United States v. Labareda*, 581 F.2d 107 (5th Cir. 1978); *United States v. Vigo*, 435 F.2d 1347 (5th Cir.), *cert. denied*, 403 U.S. 908, 91 S.Ct. 2214, 29 L.Ed.2d 684 (1971). *United States v. Westmoreland*, 841 F.2d 572, 579–80 (5th Cir.), *cert. denied*, 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 39 (1988).

We are persuaded that the district court should have limited the evidence. We cannot agree, however, that the admission of this "guilt by association" evidence was reversible error. This case stands in stark contrast to our cases holding that the admission of guilt by association evidence is reversible error in the absence of a cura-

tive instruction. First, there was no request for a limiting instruction. Second, in those cases the guilt by association evidence stood alone as an indictment of the associate. Here, the evidence of the nineteen charges of Fischbach, Lord, and Foley was only in addition to the properly admitted evidence that Fischbach, Lord, and Foley had rigged bids on Big Cajun and were part of a larger conspiracy to rig bids nationwide on similar projects. Thus, the evidence was largely cumulative. Finally, the district court carefully prohibited any evidence of the disposition of the charges in an effort to tailor the evidence to the object of its offer—that Fischbach and Moore had become "preferred clients" of the government. We are not convinced that the admission of the evidence objected to was reversible error.

## IX.

Finally, the defendants argue that the cumulative effect of prosecutorial misconduct prevented Rutland and MMR from receiving a fair trial. They point to misconduct in four areas: (1) a reference to the availability to the defense of certain witnesses the government had under subpoena, (2) comments on the defendants' failure to call certain witnesses, (3) comments on the defendants' failure to introduce certain documents, and (4) misstatements of the record.

■ In reviewing defendants' prosecutorial misconduct claim, we first determine whether the prosecutor's remarks were improper. If they were we determine "whether the prosecutor's remarks cast serious doubt upon the correctness of the jury's verdict." *United States v. Goff,* 847 F.2d 149, 165 (5th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 341 (1988).

■ Defendants first complain about the prosecutor's remark, as the government rested its case, that the government "had some witnesses under subpoena that we intended to call which we won't be calling. We will tender these to the defendants if they would like to call them, any of those that remain under subpoena." This remark seems to suggest that if defendants did not call these witnesses, it was because their testimony was unfavorable to them and, similarly, that the government had more evidence of guilt it chose not to present at trial. The government argues that the comment was in response to an earlier request by defendants that witnesses under government subpoenas be made available to them. We find no reversible error.

Defendants also object to the prosecutor's reference in rebuttal to the failure of the government to call certain MMR employees as witnesses. The government replies that the comments responded to defense arguments. Defendants argued that the change order executed by Fischbach in favor of MMR was legitimate. They argued to the jury that if the change order was not legitimate Rutland would not have sent it to the Big Cajun jobsite to Doug Frederic, an MMR employee "five levels" below Rutland. The prosecutor replied:

> If as defendants want you to believe, that this was a wholly legitimate change order, where was Mr. Frederic in this case? Where was Mr. DeLatte? Mr. Polito told you Mr. Frederic was the project engineer on this job. Mr. Polito told you Mr. LeLatte was the job superintendent. You didn't hear from those people, even though they are employees of MMR, even though they were five levels down, so-called, from Pepper Rutland and could have come in and told you exactly how these various items of work were performed and how Fischbach got value for that.

Also, after defendants argued that the $250,000 MMR paid to Fischbach in connection with the SPR bid-rigging agreement might have been a loan, the prosecutor asked the jury why MMR had not called Mr. Weems, the MMR employee in charge of financial records, to testify.

■ The prosecutor's comments on the failure of the defendants to call certain of its employees were not improper. Although a party's failure to call a witness *equally* available to both sides may not be

properly commented on, if a party fails to call a witness peculiarly within his control that may shed light on a fact issue, the prosecutor may properly comment on that failure. *United States v. Chapman,* 435 F.2d 1245, 1247 (5th Cir.1970), *cert. denied,* 402 U.S. 912, 91 S.Ct. 1392, 28 L.Ed.2d 654 (1971). That the potential witness is physically present at trial or accessible to service of subpoena by the court does not make the witness equally available to both parties. *Id.* The relationship of the witness to a party may make him or her more available to that party. *Id.* That is the case here. Although the particular witnesses referred to by the government were under subpoena, they were MMR employees who could have shed light on a fact in issue. Moreover, they could have shed light on the validity of the arguments made by defendants.

 The defendants argue that certain rhetorical questions asked by the prosecutor were improper. In response to an argument by defendants that the agreements referred to in Rutland's notes from the December 19 meeting were for legitimate work, the prosecutor pointed out that no witness said and no evidence showed that the agreement was for legitimate work. The prosecutor emphasized the lack of evidence supporting the defendants' argument with questions like "where is the document?" and "where is the witness?" The defendants contend that these questions were improper as an attempt to shift the burden of proof to the defendants. We disagree. Read in context these questions were a proper way of arguing that the defendants' argument was mere speculation unsupported by the evidence.

 The defendants argue that the prosecutor improperly referred to defendants' failure to introduce certain documents even though he "knew" the documents were not available to defendants because an earlier order of the court established that they were destroyed in the regular course of business. In rebuttal the prosecutor noted the lack of documentary support for the defendants' argument that the Borden, Freeport, and SPR jobs were not bid-rigging agreements but legitimate business deals, as well as the lack of support for the defendants' contention that the change order was legitimate. The prosecutor stated that if documents supporting defendants' arguments existed they would have been introduced.

Despite defendants' suggestion to the contrary, the government did not violate the court's pretrial ruling. That ruling merely prohibited the government from introducing evidence on the manner in which the defendants had responded to the grand jury subpoena. In its ruling, however, the court stated that most of the documents relating to the Big Cajun job were destroyed in the regular course of business and that the defendants' failure to produce more documentary material was not due to any wrongdoing by MMR. Thus, say defendants, the prosecutor knew that they did not possess these documents, knew that the documents had not been concealed or destroyed by defendants, yet still commented on defendants' failure to introduce them into evidence.

Defendants, however, misread the court's ruling. The court's ruling did not establish that the documents referred to by the prosecutor existed and were destroyed in the regular course of business. The court found only that MMR did not wrongfully destroy any documents relating to Big Cajun. But if the facts were as defendants argued to the jury—the change order and the Borden, Freeport, and SPR agreements were legitimate—it is fair argument that documents supporting their legitimacy should have existed.

Finally, defendants argue that the government misstated the record in several respects in its closing argument. After carefully reviewing the record, we are persuaded that the alleged misstatements were either not beyond the evidence or were harmless error.

AFFIRMED.