**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**
No. 91-2439

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALL STAR INDUSTRIES, ET AL.,

Defendants,

MIDCO PIPE & TUBE CO.,
RICHARD A. BRAZZALE,
MANNESMANN INTERNATIONAL
    ALLOYS, INC. (MIA),

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____

(May 28, 1992)

Before BROWN, GARWOOD, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Mannesmann International Alloys, Inc. (MIA), Midco Pipe & Tube, Inc. (Midco), and Richard A. Brazzale--former vice-president of sales at MIA--appeal their convictions for violating section 1 of the Sherman Act, 15 U.S.C. § 1, and for aiding and abetting, 18 U.S.C. § 2, by conspiring to fix the prices of specialty pipe sold through Texas Pipe Bending Company (TPB). Specifically, these defendants assert that the district court erred in instructing the jury and abused its discretion in ordering restitution. Finding no error, we affirm.

**I**

This case involves an alleged conspiracy between six corporations[1] and three individuals[2] to fix the prices of specialty pipe sold to TPB for purchase by TPB's customers under a cost-plus contractual arrangement--a violation of section 1 of the Sherman Act[3] and the aiding and abetting statute.[4] Specifically, the indictment alleges that TPB and its distributors conspired to eliminate competition on specialty pipe bids submitted to TPB for its cost-plus contracts.[5]

---

[1]     They are (1) TPB; (2) Capitol Pipe and Steel Products, Inc. (Capitol), (3) U.S. Metals, Inc. (U.S. Metals), (4) All Star Industries, Inc. (All Star), (5) MIA, and (6) Midco.

[2]     They are (1) Carlton H. Bartula, (2) Richard A. Brazzale, and (3) Ronald S. Palma.

[3]     15 U.S.C. § 1.

[4]     18 U.S.C. § 2.

[5]     Specialty pipe is used in oil refineries and power plants to transport materials when carbon steel pipe is ineffective--for example, when the materials are corrosive or of extremely high or low temperatures.  This specialty pipe often needs to be bent into shape and welded to fit the configurations of a particular  project--an endeavor that is generally done more economically at a pipe fabricator's shop than at a job site. When the precise quantities of each size and grade of pipe are unknown at the time of contract, contracts with fabricators for specialty pipe generally call for the fabricators to purchase pipe from distributors on a cost-plus basis.  In this situations, specialty pipe purchasers pay fabricators (1) the invoice price of the pipe plus (2) a bargained-upon percentage of that price as the fabricator's markup.
Because prices for specialty pipe are volatile and it is difficult for specialty pipe purchasers to predict their needs, purchasers expect this cost-plus arrangement to bring about a lower overall cost than the alternative--paying a pipe fabricator a fixed price which would include a contingency for assuming the market risk.  Specialty pipe purchasers generally believe that the fixed-price method would inflate bids to the point of making the present specialty pipe market system--that is, reliance on

At trial, twelve alleged co-conspirators--including a former MIA sales manager, a former MIA executive vice-president, and two former Midco vice-presidents--described the conspiracy and their participation in it. According to these witnesses, when TPB was awarded a fabrication job on a cost-plus basis, Bartula--TPB's head purchasing agent--decided which distributors should submit bids. These distributors included All Star, Midco, MIA, Capitol, Guyon, and U.S. Metals. Bartula or another TPB employee would then ask Palma[6] to "quarterback" the job--that is, to act as a go-between among the distributors and TPB by discussing the prospective bids, allocating various material among the bidders, and working with the bidders to decide the prices each would submit to TPB.

Specifically, Bartula or Palma would call selected bidders to inform them that (1) they would be receiving a request for a quotation on a cost-plus job, (2) Palma would quarterback the job, and (3) the job was to be handled on a "code 5", "10", or "15" basis--meaning that the job was to be rigged and TPB would

---

independent pipe fabricators who do the work off site-- uneconomical. To assure that they receive competitive prices, purchasers generally require pipe fabricators to solicit and submit competitive bids from three or more distributors.

Between 1981 and 1984, there were only 5-7 of these specialty pipe distributors in the market. However, fabricators such as TPB sometimes carried their own specialty pipe inventory and were able to bid against the pipe distributors. *See infra* note 15 and accompanying text.

[6] Palma worked for Capitol in 1981 and 1982, and then for his own company--All Star--in 1983 and 1984.

receive either a five, ten, or fifteen percent kickback. The distributors then padded their bids accordingly, adding this five-to-fifteen percent onto their bids and rebating the money to TPB in the form of a "credit memo" or check. TPB and its distributors sometimes referred to this scheme as TPB's "volume discount program."

As quarterback, Palma would discuss the bidders' preferences and agree on an allocation among them of the materials needed. The bidders who were designated winners would then determine their prices. In addition to the five-to-fifteen percent added to the bid price for TPB's kickback, these bid prices included higher than normal markups resulting in prices generally 20 percent--and as much as 75 percent--higher than competitive prices. Palma would then pass these inflated prices onto the other bidders who would protect them by bidding higher. Work was usually awarded according to the allocation agreed upon by the distributors.

**B**

TPB, Capitol, and U.S. Metals entered into plea agreements. All Star, MIA, Midco, Bartula, Brazzale, and Palma went to trial and were convicted by a jury on March 19, 1990. Judgments of conviction were entered on May 20, 1991: The district court fined each of the corporate defendants $250,000 and, as a condition of probation, ordered them jointly and severally liable for restitution in the amount of $859,935; Bartula was sentenced to three years imprisonment, with all but the first six months

-4-

suspended; Brazzale and Palma received suspended sentences and were placed on probation for five years.  MIA, Midco, and Brazzale appeal their convictions.

## II

Defendants challenge both the district court's (**A**) jury instruction and (**B**) its award of restitution.  Defendants' jury instruction challenge fractures into assertions that the district court erred in:

> (**1**) instructing the jury under the per se rule analysis,
>
> (**2**) refusing to instruct the jury on "rule of reason" analysis, and
>
> (**3**) refusing to instruct the jury on the theories of defense (that is, good faith and lack of specific intent).

As for its award of restitution, MIA asserts that the district court abused its discretion by:

> (**1**) ordering restitution for injuries outside the limitations period,
>
> (**2**) failing to credit MIA for payments made to settle related civil claims, and
>
> (**3**) making restitution joint and several.

## A

### 1-2

Section 1 of the Sherman Act provides in part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."  15 U.S.C. § 1.  Despite the scope of its

literal meaning, the Supreme Court has always recognized that section 1 was "intended to prohibit only *unreasonable* restraints of trade." *Business Electronics v. Sharp Electronics*, 485 U.S. 717, 723, 108 S. Ct. 1515, 1519 (1988) (emphasis added). Therefore, "[o]rdinarily, whether [a] particular concerted action violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason--that is, `the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'" *Id*. (citation omitted).

However, the Court has also introduced a shortcut around case-by-case rule of reason analysis: the Court has found certain agreements to be so egregiously anticompetitive "that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases." *Broadcast Music, Inc., v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 7-8, 99 S. Ct. 1551, 1556 (1979); *see also Business Electronics*, 485 U.S. at 723-24, 108 S. Ct. at 1519 ("Certain categories of agreements, however, have been held to be *per se* illegal, dispensing with the need for case-by-case evaluation.").[7] "[A]greements among competitors to fix prices on

---

[7] The policy undergirding this per se unreasonableness approach is to avoid "the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable--an inquiry so often wholly fruitless when undertaken." *Broadcast Music*, 441 U.S. at 8, n.11, 99 S. Ct. at

-6-

their individual goods or services are among those concerted activities that the Court has held to be within the *per se* category." *Broadcast Music*, 441 U.S. at 8, 99 S. Ct. at 1556.[8] The district court found the price fixing arrangement between TPB and its distributors to be such an agreement and instructed the

1556 n.11, *quoting Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S. Ct. 514, 518 (1958) (citations omitted). The standard test for determining application of this per se rule is whether the business practice "facially appears to be one that would always or almost always tend to restrict competition and decrease output. . . ." *Id*. at 19-20, 99 S. Ct. at 1562, *citing United States v. Gypsum Co.*, 438 U.S. 422, 436 n.13, 441 n.16, 98 S. Ct. 2864, 2873 n.13, 2875 n.16 (1978).

[8] *Id*. at 9, 99 S. Ct. at 1557 ("As generally used in the antitrust field, `price fixing' is a shorthand way of describing certain categories of business behavior to which the *per se* rule has been held applicable."); *see Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647, 100 S. Ct. 1925, 1927-28 (1980) (price fixing agreement among competitors is archetypal example of conduct that is illegal per se); *Northern Pac. Ry. Co.*, 356 U.S. at 5, 78 S. Ct. at 518 (price fixing is illegal per se "without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use."); *United States v. MMR Corp.*, 907 F.2d 489, 495 (5th Cir.) (Where defendants were charged with bid rigging in violation of Sherman Act, holding that "[i]t is enough that the government shows that the defendants accepted an invitation to join in a conspiracy whose object was unlawfully restraining trade.") (citation omitted), *cert. denied*, 111 S. Ct. 1338 (1990); *United States v. Flom*, 558 F.2d 1179, 1183 (5th Cir. 1977) ("An agreement that one company would not submit a bid lower than another is price fixing of the simplest kind and is a *per se* violation. . . .") (citation omitted). Thus, "[i]n cases involving behavior such as bid rigging . . . the Sherman Act will be read as simply saying: `An agreement among competitors to rig bids is illegal.'" *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir.), *cert. denied*, 454 U.S. 1083, 102 S. Ct. 639 (1981), *quoting United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1106 (7th Cir.), *cert. denied*, 444 U.S. 840, 100 S. Ct. 79 (1979).

jury accordingly, thereby rejecting the rule of reason instructions proposed by defendants.[9]

The government asserts a conspiracy among distributors to fix the price of specialty steel and pass that non-competitive price onto end users. To diminish the importance of their horizontal agreement to rig specialty steel bidding, defendants emphasize the vertical component of the conspiracy--that is, TPB's involvement--by proffering a hostage ("TPB made us do it") theory:

> The unique fact of this case is that the pipe distributors did not, as in a conventional case, come together voluntarily to fix prices on products to be sold to their customers. Rather, directions flowed the other way. It was the suppliers' customer, Texas Pipe Bending . . . , which directed its suppliers in the scheme. TPB dictated the prices in the bids it expected to receive from suppliers. TPB then purchased and took title to the goods, which were passed on to the end users.[10]

---

[9]    The district court's jury instructions are discussed and quoted *infra* at notes 19-20 and accompanying text.

[10]    Reply Brief for Appellant Midco Pipe & Tube, Inc. at 3, *United States v. All Star*, No. 91-2439 (5th Cir. filed Dec. 12, 1991) ["Midco Reply Brief"]. Defendants rely upon *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440 (3d Cir.), *cert. denied*, 439 U.S. 866 (1978), to argue that this case simply involves "sham bidding" orchestrated by a buyer, and, therefore, is not a per se violation of the Sherman Act. Specifically, defendants cite *Sitkin,* 575 F.2d at 447, for the proposition that the mere existence of sham bidding does not create a presumptive violation of the Sherman Act, and *United States v. Fischbach & Moore, Inc.*, 750 F.2d 1184, 1196 (3d Cir. 1984), *cert. denied sub nom.,* 470 U.S. 1029, 105 S. Ct. 1397 (1985), for the proposition that no antitrust violation can arise if a customer--defendants allege that TPB, not the specialty steel end users, was their customer--acquiesces in the transaction or conspiracy. We find *Sitkin* easily distinguishable, however, for in that case there was no horizontal collusion among competing buyers or sellers. *See Sitkin*, 575 F.2d at 446-48. As the court explained, "The price-fixing within the scope of the per se prohibition of § 1 .

In sum, defendants would have us believe that (1) they dealt only with TPB and not with each other, (2) TPB told them what to bid and, for the sake of staying in business, they did what they were told, and, (3) after their deals were done, TPB went forth on its own to cheat its customers, the specialty pipe end users, with inflated prices.[11]  However, the record stages a very different

_____

. . is an agreement to fix *the price to be charged in transactions with third parties, not between the contracting parties themselves*."  *Id*. at 446 (emphasis added).

> [11]    Specifically, MIA and Brazzale assert that:
> The indictment describes a scheme whereby TPB, a customer of Mannesmann and other pipe distributors, directed them to submit prearranged bids to it for its use in satisfying cost-plus contracts between TPB and its own customers--the "end users"--when the contracts require competitive bidding.  No antitrust injury results from this conduct.
> * * *
> What the government has done is turn a business tort by TPB against its customers into a criminal antitrust conspiracy against those customers by parties who did not contract with them but only with TPB, parties who did not tell TPB what to do with its pricing and who had no relationship with TPB's customers.

Brief of Defendants-Appellants Mannesmann International Alloys, Inc. and Richard A. Brazzale at 10, 17, *United States v. All Star Industries*, No. 91-2439 (5th Cir. filed Oct. 16, 1991) ["MIA Brief"].

Midco asserts that, "[b]ecause TPB's arrangement with its distributors was vertical[--that is, TPB  purchased specialty pipe as [Midco's] customer, fabricated it, and then resold it to the end users who were TPB customers--]and caused no demonstrable economic harm, the [district] court should have submitted [their] rule of reason instructions.  At the very least, it should have submitted the case to the jury under the alternative theories of per se liability and rule of reason analysis."  Brief for Appellant Midco Pipe & Tube at 24, *United States v. All Star Industries*, No 91-2439 (5th Cir. filed Oct. 11, 1991) ["Midco Brief"].  Midco relies upon *Business Electronics v. Sharp Electronics*, 485 U.S. 717, 108 S. Ct. 1515 (1988), for the proposition that the agreement between specialty pipe distributors and TPB was vertical, thereby making the per se rule inapplicable.  However, we find *Sharp* easily distinguishable since that case involved a wholly vertical restraint--an

-9-

scenario: where specialty pipe distributors, TPB, and specialty pipe end users were united by underlying cost-plus contracts, distributors who were normally horizontal competitors conspired to rig their bids *with the explicit intention* of inflating the cost aspect of cost-plus contracts and deceiving specialty steel end users.[12] The conspiracy depended upon distributor

---

agreement between a manufacturer and a dealer to terminate another dealer--without any agreement on price or price levels. *Id*. at 735-36, 108 S. Ct. at 1525 ("In sum, economic analysis supports the view, and no precedent opposes it, that a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels.").

[12] The record establishes that defendant distributors were fully aware of their role in the overall scheme contrived by TPB--that is, they knew they were rigging bids only on cost-plus contracts that required TPB to obtain competitive bids and also required the end user-buyers to pay the full rigged priced for the specialty pipe plus TPB's markup. *See infra* notes 13-15 and accompanying text. As for the involvement of Midco and MIA in this conspiracy, consider the following:

> **--** MIA's involvement in the conspiracy is captured by the testimony of Lorne Van Stone, former executive vice-president of MIA:
> Q    And what did Mr. Brazzale explain that he and Mr. Palma did to set price levels?
> A    Well, they told me that they would discuss the job and decide which items that International Alloys was going to get and that we would protect prices for the other competitors and we would get our share of the order.
> Q    And what did you understand "protect other competitors" to mean?
> A    To keep our prices high to protect their prices so that they would receive the job.
> Q    So would you explain to us how that would work as a
> mechanical matter on a Mannesmann bid as you understand that process?
> A    We would sell many times above our usual prices in order to protect the prices in the marketplace at Texas Pipe Bending. And where we were picked to take certain items, we would be low on those and somebody else would

protect our prices.

* * *

A    My understanding was the three or four times that I

remember that we got part of the jobs, not
all of the jobs, we got part of the jobs
after [Mr. Brazzale] would have had a meeting
with Mr. Palma.  That is my understanding.

* * *

Q    Did Mr. Brazzale ever explain to you how it came to

be that Mannesmann would win items on some of
these bids to Texas Pipe Bending where he and
Mr. Palma were talking?

* * *

A    They would get the other distributors to raise their

prices to protect ours on the items that we
were to be given.

Q    And did Mannesmann protect the other distributors on

the rest of the items?

A    Yes.

* * *

Q    Did Mr. Brazzale ever tell you the names of other
competitors whose prices Mannesmann was
protecting?

A    Yes.

Q    Whose names did he tell you?

A    U.S. Metals

* * *

Q    Any other company?

A    Gulf Alloys.

Q    Any other company?

A    Charles F. Guyon Alloys.

Record on Appeal, vol. 37, at 8-55, 8-61 to 8-64, *United
States v. All Star Industries*, No. 91-2439 (5th Cir.
filed Aug. 6, 1991) ["Record on Appeal"].

-- The record also contains testimony regarding Midco's
involvement from Sam Rossetti, Midco's former vice-
president and sales manager:

Q    After Midco entered into this agreement with All
Star and Mr. Palma, was there a change in
Midco's ability to make sales to the Texas
Pipe Bending Company?

A    Yes, sir, very much so.

Q    And what was that change?

A    We had a hundred percent increase in business over
and above what we used to do before.

-11-

```
Q    Not to quibble with you, but if you had one sale
     before, a hundred percent increase would make
     it two sales.  How big an increase was it?
A    Astronomical.
                       * * *
Q    Did Midco pay--make payments to Texas Pipe Bending
     during the '83-'84 period pursuant to the
     volume discount arrangement?
A    Yes, sir.
                       * * *
Q    Would you describe for us the substance or the
gist
     of these calls that you had with Mr. Palma?
A    He would tell me whether or not they were hard
     dollar jobs or whether or not they were 10 or
     15 percent jobs.
                       * * *
Q    Were you told the amount of the quality discount
     before or after Midco made up its bid to
     Texas Pipe Bending?
A    Before.
Q    Why were you told before?
A    You would have to know how much to add into the
     price.
Q    What do you mean you would have to know how much
to
     add into the price?
A    If we were giving Texas Pipe Bending 10 or 15
     percent, we would certainly have to cover it
     in the price we were quoting.
Q    Did Midco--was there any profitability into the
     Midco quotes to Texas Pipe Bending for Midco
     in addition to whatever you were putting in
     for the Texas Pipe Bending Company?
A    Yes.
                       * * *
Q    On the bids that Midco submitted to the Texas Pipe
     Bending Company during the 1983-'84 period,
     did the Midco bids show on their face the
     amount of the discount that was included?
A    No.
Q    Did the Midco bids in '83-'84 show on their face
     that All Star and Mr. Palma were acting as
     your sales agent?
A    No.
                       * * *
Q    Would you explain for us what that notation means?
A    Well, Texas Pipe Bending would be given 15 percent
     of the selling price of the order.  And 25
     percent of the gross profit after all
```

expenses would be paid to All Star Industries.

Q    . . . was that a notation that went on documents that left the Midco Company?

A    No.

* * *

A    [Mr. Palma] would tell me to protect certain prices on certain bids.

* * *

Q    And what did you do with the information when Mr. Palma told you to protect certain bids?

A    I raised the prices that we were bidding.

Record on Appeal, vol. 38, at 9-163 to 9-166, 9-168 to 9-172;

*see also* Record on Appeal, vol. 39, at 10-31 to 10-32:

Q    When Midco put in a bid with a protect number, was that a number that Midco chose as a competitive number?

A    No.

Q    Where did Midco get that number to bid above?

A    From Mr. Palma.

-- The testimony of Robert Cohn, Midco's former executive vice-president and president, further substantiates Midco's participation in the conspiracy:

Q    What use did you make of the information that Mr. Palma gave you about protecting prices?

A    We protected the prices by quoting a higher one than was mentioned.

* * *

Q    How accurate was Mr. Palma's information about which items Midco would get and not get?

A    I can never remember them being in error.

* * *

Q    Did there come a point in time--did you ever learn whether or not All Star was bidding on the same jobs as Midco?

A    We did.  I did.

* * *

Q    Why did you continue to use All Star's services-- excuse me, why did you continue to use Mr. Palma's and All Star's services after you had learned those factors?

A    Because Midco--and we felt that whatever business we might get would be more than we would get otherwise.

-13-

cooperation and participation, and the distributors obliged:

> -- Distributors knew that TPB was required to submit at least three competitive bids to its customers for their approval, and they took pains to make these bids look legitimate to the end users.[13]

> -- Distributors did not allocate jobs exactly evenly because knew that would look suspicious, meaning that the distributors made a deliberate effort to maintain the appearance of competitive bidding. *See supra* note 12.

> -- Even on contracts for items they knew they would not be getting because they were protecting the prices of other bidders, the distributors would "develop" their prices by calling manufacturers to give them the impression that distributors were preparing competitive bids.[14]

---

Record on Appeal, vol. 39, at 10-40 to 10-44.

[13]   This is substantiated by the testimony of James Dooner, who was employed by Capitol from 1966 through 1969 and its competitor, Guyon, from 1969 through 1985 as a sales supervisor for all southwestern states:

```
Q    Now, Mr. Dooner, did you have some expectation about
     what percentage of the sales on rigged bids
     to TPB you were going to win?
A    On a specific order?
Q    Yes.
A    The percentage varied.  But the answer is yes
     because there are some items we didn't
     receive at all.
Q    Did you expect to get a share equal to the other
distributors on each sale?
A    Yes.
                        * * *
Q    Did you always get -- if there were three bidders,
         did you always get 33 percent of
         the sales of a rigged bid?
A    No.
Q    Why not?
A    The percentage varied because being an equal
     percentage would look as if it was pre-done.
```
Record on Appeal, vol. 32, at 3-56 to 3-58.

[14]   This effort to make end users believe that the distributors' bidding was competitive is described by the testimony of Steve Scott, president of U.S. Metals:

```
Q    If you could just tell the jury if you ever did
```

-14-

Rather than merely being these distributors' customer who then went on to cheat its own customers, TPB was the distributors' conduit for passing their inflated, non-competitive specialty steel bids onto unsuspecting end users.  Moreover, in at least one instance, TPB was also the distributors' horizontal "competitor" who benefited from the conspiracy at their level.[15]

Accordingly, we find that defendants cannot escape the per se rule simply because their conspiracy depended upon the

<div style="margin-left:2em;">

anything, you personally ever did anything to make it look like you were competing on the jobs where quarterbacking was going on?
A    By developing prices with all the manufacturers.
Q    You developed prices with all the manufacturers, that is what you are saying?
A    Yes.
Q    Why would -- what was the purpose of that?
A    Two-fold.  To have an idea of the overall value of the project.  And give the manufacturers that appearance that we were developing competitive prices on the whole job.
Q    Now, Mr. Scott, you personally worked on bids to Texas Pipe Bending on sales that were quarterbacked; is that right?
A    That is correct.
Q    And you also submitted bids to Texas Pipe Bending on sales that weren't quarterbacked; is that right?
A    That is correct.

</div>

Record on Appeal, vol. 40, at 11-126.  Therefore, while the "winning bidder" did not sell its product directly to the end user, it knew who its end user was and that it had successfully deceived that end user into paying a rigged price for its product.  *Id*.

[15]    Government Exhibit 13a is a TPB breakdown listing materials needed to fulfill its cost-plus contracts with a "G", "C", or "M" beside the entries to indicate which company--Guyon, Capitol, or MIA--the work was designated to.  Some of the entries are flagged "TPB stock protect", meaning that TPB had the materials in its inventory, would bid along with the distributors, and that bidding for these materials would be rigged so that TPB would win.

participation of a "middle-man", even if that middleman conceptualized the conspiracy, orchestrated it by bringing the distributors together around contracts it held with its buyers, and collected most of the booty.[16]  We find, therefore, that the district court did not err by instructing the jury in accordance with the per se rule and refusing defendants' rule of reason instruction.

<div align="center">3</div>

Defendants also challenge the district court's jury instruction on the grounds that the district court should have instructed the jury on their theories of defense--that is, good

---

[16]    The government argues that the case before us is analogous to *United States v. MMR Corp.*, 907 F.2d 489 (5th Cir. 1990), *cert. denied sub nom.*, 111 S. Ct. 1388 (1991)--a case in which defendants were also convicted of conspiracy to rig bids in violation of the Sherman Act after the district court applied the per se liability rule.  There we considered a similar contention: defendants argued that, since MMR lacked the bonding capacity to successfully bid the project at issue and, therefore, could not successfully compete with other conspirators, MMR was not an actual competitor and per se liability rules did not apply.  *Id.* at 496-97.  We rejected that contention, holding that:

> even if MMR is deemed not to be an actual or potential competitor of Fischbach and the other companies, the conspiracy was not a meaningless conspiracy between noncompetitors since [other actors] were competitors. . . . [A] noncompetitor can join a Sherman Act bid-rigging conspiracy among competitors.  If there is a horizontal agreement between A and B, there is no reason why others joining that conspiracy must be competitors. . . .  Second, the facts of this case illustrate how a company, although arguably unable in fact to carry out its competitive threat . . . can nonetheless further a conspiracy among competitors.

*Id.* at 498.  Applying our *MMR* holding to the case at issue, even if TPB is deemed not to be an actual competitor, the bid-rigging conspiracy was not a meaningless conspiracy between noncompetitors.  The distributors were horizontal competitors and, at least on one occasion, TPB bidded along with them.  *See supra* note 15.

faith and lack of specific intent.  Specifically, they argue that, "[e]ven assuming, hypothetically, that this case involves a per se violation of the [S]herman [A]ct, there still must be evidence that the defendant intended to commit the specific intent offense charged."[17]

We recognize that, "[w]hen a defendant properly requests an instruction on a theory of defense that is supported by some evidence, it is reversible error not to adequately present the theory."  *United States v. Johnson*, 872 F.2d 612, 622 (5th Cir. 1989) (reviewing instruction as a whole and holding that instruction on defense theory of entrapment was adequate); *see also United States v. Schmick*, 904 F.2d 936, 943 (5th Cir. 1990) ("It has long been well established in this Circuit that it is reversible error to refuse a charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent.") (citations omitted), *cert. denied sub nom.*, 111 S. Ct. 782 (1991).  However, when considering such a jury instruction challenge on appeal, we read the district court's instruction as a whole to determine whether it accurately reflects the law.  *See United States v. Daniel*, 957 F.2d 162, 169 (5th Cir. 1992) (viewing jury instruction as a whole and holding that lack of good faith instruction and inclusion of instruction on deliberate ignorance does not constitute reversible error); *United States v. Hagmann*, 950 F.2d 175, 180 (5th Cir. 1992)

---

[17]     Midco Reply Brief at 16.

("When a charge is challenged on appeal, we evaluate it in its entirety, looking to see whether the charge *as a whole* was correct."); *United States v. Featherson*, 949 F.2d 770, 777 (5th Cir. 1991) ("The standard of review for jury instructions is usually whether the court's charge, as a whole, is a correct statement of the law and plainly instructs the jurors as to the principles of law applicable to the fact issues confronting them."), *cert. denied sub nom.*, __ S. Ct. __ (1992).

We have found that it was proper for the district court to instruct the jury in accordance with the per se rule. *See supra* Part II.A.1-2. Therefore, the government's only burden was to prove that the per se agreement alleged was in fact made and that

defendants knowingly and intentionally joined that agreement.[18]

    The district court instructed the jury as follows:

---

[18]    A price fixing conspiracy under the Sherman Act is not a crime requiring proof of a "specific intent" to restrain trade or to violate the law. *See American Tobacco Co. v. United States*, 328 U.S. 781, 809-10, 66 S. Ct. 1125, 1139 (1946) ("No formal agreement is necessary to constitute an unlawful conspiracy. . . . Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified."); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227, 59 S. Ct. 467, 474 (1939) ("Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish unlawful conspiracy under the Sherman Act."). The intent element of a per se offense is established by evidence that the defendant agreed to engage in conduct that is per se illegal; the government is not required to prove that the defendant knew his actions were illegal or that he specifically intended to restrain trade or to violate the law. *See United States v MMR Corp.*, 907 F.2d 489, 495 (5th Cir. 1990), *cert. denied sub nom.*, 111 S. Ct. 1388 (1991):

> The government . . . is not required to prove a formal, express agreement with all the terms precisely set out and clearly understood by the conspirators. . . . It is enough that the government shows that the defendants accepted an invitation to join in a conspiracy whose object was unlawfully restraining trade.

*See also United States v. Young Brothers, Inc.*, 728 F.2d 682, 687 (5th Cir.) ("In order to prove that appellant actually intended to enter into the bidrigging conspiracy, the government was required to show that appellant knowingly joined or participated in the conspiracy."), *cert. denied*, 469 U.S. 881, 105 S. Ct. 246 (1984); *United States v. Brown*, 936 F.2d 1042, 1045-46 (9th Cir. 1991) (holding that district court did not err in "holding that it was unnecessary to instruct the jury that intent to produce anticompetitive effects is an element of the offense of which [defendants] were convicted."); *United States v. W.F. Brinkley & Sons Constr. Co.*, 783 F.2d 1157, 1161-62 (4th Cir. 1986) ("The word `knowingly' as that term has been used from time to time in these instructions means that the act was done voluntarily and intentionally and not because of mistake or accident."); *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir.) ("In cases involving behavior such as bid rigging . . . the Sherman Act will be read as simply saying: `An agreement among competitors to rig bids is illegal.'") (citation omitted), *cert. denied*, 454 U.S. 1083, 102 S. Ct. 639 (1981).

To establish the required intent the Government must prove beyond a reasonable doubt that the defendants knowingly and willfully did something which the law forbids. In this case, that means that the Government must prove beyond a reasonable doubt that the defendants knowingly and willfully formed, joined or participated in a combination or conspiracy to rig bids. Since a combination or conspiracy to rig bids is unreasonable and illegal as a matter of law, the Government does not have to prove that the defendants specifically intended to unreasonably restrain trade or that such conduct is an unreasonable restraint of trade.[19]

We find that, read as whole, this instruction accurately reflects the law--that is, the district court correctly instructed the jury that the government had to establish beyond a reasonable doubt that (1) the bid rigging conspiracy charged in the indictment was knowingly and willfully formed, (2) each defendant knowingly and willfully became a member of that conspiracy, and (3) the conspiracy affected or occurred in the flow of interstate commerce.[20] Moreover, because the bid-rigging agreement alleged

---

[19]     Record Excerpts of Defendants-Appellants at tab 30, *United States v. All Star Industries, Inc.*, No. 91-2439 (5th Cir. filed Oct. 16, 1991) (jury instruction No. 12) ["Record Excerpts"].

[20]     *See* Jury Instruction No. 9, in Record Excerpts at tab 30. The district court also instructed the jury as to:  the elements of a conspiracy (Jury Instruction No. 10) ("A conspiracy under Section I of the Sherman Act is an unlawful agreement by two or more persons or corporations to accomplish a common objective which would result in an unreasonable restraint of interstate commerce."); what constitutes "knowing" and "willful" and that "the Government must prove beyond a reasonable doubt that the defendants knowingly and willfully formed, joined or participated in a combination or conspiracy to rig bids (Jury Instruction Nos. 11-12); what constitutes bid rigging and the significance of such a finding (Jury Instruction No. 13) ("In this case, if you find beyond a reasonable doubt that a defendant was a member of a conspiracy to rig bids as alleged in the indictment, then you need not decide whether such conspiracy was

by the government was per se illegal, defendants' other theories of defense--theories incorporated in defendants' proposed instructions which the district court rejected--were irrelevant, and we find that the district court did not err in rejecting them.[21]

---

reasonable or unreasonable because . . . an agreement among competitors not to compete for contracts by submitting collusive bids is per se unreasonable and a violation of the Sherman Act."); that good faith is no defense (Jury Instruction No. 15: "A conspiracy to rig bids in or affecting interstate trade and commerce is unlawful, even though the conspiracy may be formed or engaged in for what appear to the conspirators to be laudable motives.") (Jury Instruction No. 20:  ". . . the fact that a defendant may have believed, in good faith, that what was being done was not unlawful would not be a defense.").  *Id*.

[21]    Defendants assert that their actions caused no economic harm.  Specifically, they assert that, "if the end users were unhappy with the bids that TPB solicited, they could reject them.  Some did.  If they were unhappy with the entire program, they could have negotiated for a fixed price contract.  If offended by TPB's allocation, they could have proceeded against TPB for breach of contract."  Midco Brief at 13.  Defendants also assert that, even if end users were harmed, the distributors did not benefit from the price-rigging arrangement since TPB collected all the conspiracy profits: "If a price is raised 15% and then a 15% rebate is made, the supplier would make no more profit than if none of that occurred."  Midco Reply Brief at 8.  They also assert that their "involvement in the alleged conspiracy . . . occurred after the end users had already reaped the benefits of competition, the negotiated low percentage plus on their cost-plus contracts.  Therefore Midco's acts were not likely to cause harm, not plainly anticompetitive and not properly subject to per se analysis."  *Id*. at 13.
     Where there is a per se illegal price-fixing agreement, it is no defense that the agreement at issue did not have anticompetitive effects, or that defendant's motives were benevolent. *See N.C.A.A. v. Board of Regents of Univ. of Okl.*, 468 U.S. 85, 109-110, 104 S. Ct. 2948, 2964-65 (1984) (Holding that, "when there is an agreement not to compete in terms of price or output, `no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'") (citation omitted); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59, 60 S. Ct. 811, 845 n.59 (1940) (citation omitted):
     But that does not mean that both a purpose and a power

-21-

to fix prices are necessary for the establishment of a conspiracy under § 1 of the Sherman Act. That would be true if power or ability to commit an offense was necessary in order to convict a person of conspiring to commit it. But it is well established that a person "may be guilty of conspiring, although incapable of committing the objective offense."

*See also United States v. Cargo Service Stations, Inc.*, 657 F.2d 676, 683-84 (5th Cir. 1981), *cert. denied*, 455 U.S. 1017, 102 S. Ct. 1712 (1982) (defendants need only knowingly and intentionally join conspiracy to rig bids) (per se rule condemns conspiracies never implemented, as well as those that fail to achieve their objectives and produce no anticompetitive effects); *id*. at 683 ("We think it follows that if price fixing is inevitably an unreasonably restraint of trade, the intent to fix prices is equivalent to the intent to unreasonably restrain trade.").

Moreover, there is evidence in the record that distributors ended up charging end users prices inflated 10 to 15 percent above competitive prices. Record on Appeal, vol. 37, at 8-34 (testimony of Bruce Painchaud, an MIA employee from 1978 through 1987). Although, as pointed out by defendants, the bidding arrangement between end users and TPB allowed the end users to reject the distributors' bids, we cannot fault the end users for accepting them. The end users took precautions to insure that the specialty steel bids incorporated into TPB contracts were competitive by requiring TPB to provide at least three bids-- precautions which were overcome by conspiracy.

And finally, although TPB may have reaped most of the rewards from this markup, the distributors still benefited from the bid-rigging arrangement in that their participation guaranteed them a share of the contracts:

-- Consider the testimony of Robert Cohn, executive vice- president and then president of Midco during the years 1981-1984:

Q    Why did you protect those prices as requested by Mr.
     Palma?
A    Because Mr. Palma was our agent and he was on the
     scene and we assumed he knew what he was
     doing and we followed his instructions.
                    * * *
Q    Why did protecting another competitor's price help
     Midco get business with Texas Pipe?
A    Well, I don't believe that every order would go to
     one single company because we, Midco couldn't
     get every piece of business. And someone
     else
     might have had a better inventory of a
     commodity or a better price.

-22-

**B**

As a condition of probation, the district court ordered the corporate defendants jointly and severally liable for restitution to the victims of their conspiracy in the amount of $859,935.[22] MIA now asserts that the district court abused its discretion by:

---

Record on Appeal, vol. 39, 10-41.

-- Rossetti's testimony further substantiates that the distributors benefited from the conspiracy arrangement:
Q    Why did Midco put down protected numbers on some of
     its bids to Texas Pipe Bending Company?
A    Well, we were told to, and the only way we would get
     business was by participating on this basis.
                         * * *
Q    How did you know this was the only way you would get
     business?
A    Because this was the way it was happening and we
     were getting it on that basis.
Record on Appeal, vol. 38, at 9-171 to 9-172; *id*. at 9-163 (quoted more extensively *supra* note 12):
Q    After Midco entered into this agreement with All
     Star and Mr. Palma, was there a change in
     Midco's ability to make sales to the Texas
     Pipe Bending Co?
                         * * *
Q    Not to quibble with you, but if you had one sale
     before, a hundred percent increase would make
     it two sales.  How big an increase was it?
A    Astronomical.

[22]    The district court ordered this restitution pursuant to section 3651 of the Probation Act.  18 U.S.C. § 3651 (1985).  While this section has been repealed, the Probation Act which predated the Sentencing Reform Act still applies to offenses committed before November 1, 1987.  *See United States v. Balboa*, 893 F.2d 703, 706 (5th Cir. 1990) (holding that, although probation statute was repealed by Sentencing Reform Act, old provision continued to apply to offenses which occurred before effective date of Act, Nov. 1, 1987).

-23-

(**1**) ordering restitution that covers injuries occurring outside the limitations period for antitrust violations,

(**2**) failing to credit Mannesmann for payments made to settle civil claims involving the same conduct and parties, and

(**3**) making restitution a joint and several obligation against Mannesmann since Mannesmann was not involved in several projects for which restitution was awarded.

**1**

MIA raises an assertion before this court that it did not raise below--that, because the statute of limitations for antitrust violations is five years, MIA cannot be made to pay restitution for losses occurring more than five years before the return of the indictment.  Because this contention was not raised below, we review it only for plain error--that is, we look to see whether "our failure to consider the question results in `manifest injustice.'"  *United States v. Gerald Vonsteen*, 950 F.2d 1086, 1092 (5th 1992) (citation omitted); *see United States v. Sherbak*, 950 F.2d 1095, 1101 (5th Cir. 1992) ("[I]ssues raised for the first time on appeal `are not reviewable by this [c]ourt unless they involve purely legal questions and failure to consider them would result in manifest injustice.") (citations omitted).[23]

---

[23]    *See also United States v. Campbell*, 942 F.2d 890, 894 n.2 (5th Cir. 1991) ("Because Campbell raises this claim for the first time on appeal, the issue is deemed waived."); *United States v. Jackson*, 700 F.2d 181, 190 (5th Cir.), *cert. denied*, 464 U.S. 842, 104 S. Ct. 139 (1983) ("We have long held that, absent a showing of manifest injustice, a litigant may not raise a theory on appeal that was not presented to the district court.").

A Sherman Act conspiracy is a partnership in crime that continues until all its objectives have been accomplished or abandoned. *See United States v. Kissel*, 218 U.S. 601, 607-08, 31 S. Ct 124, 126 (1910) ("A conspiracy to restrain or monopolize trade by improperly excluding a competitor from business contemplates that the conspirators will remain in business, and will continue their combined efforts to drive the competitor out until they succeed.") ("A conspiracy is a partnership in criminal purposes . . . . [and] an overt act of one partner may be the act of all without any new agreement specifically directed to that act."). MIA was convicted of participating in a single continuing conspiracy that began more than five years before the indictment was returned, but which did not end until 1984--a time within the five-year period of limitations. Under the Probation Act,[24] the only limits on restitution are that repayment must relate (i) to the particular offense of which the defendant was convicted and (ii) to the actual losses suffered by the victim. *See United States v. Boswell*, 565 F.2d 1338, 1343 (5th Cir.) ("As a condition of probation a district court undoubtedly has the authority to require that a defendant make restitution to injured parties for the *actual loss* or damage caused by the offense for which he stands convicted . . . .") (citations omitted) (emphasis in original), *cert. denied*, 439 U.S. 819, 99 S. Ct. 81 (1978); *see also United States v. Stuver*, 845 F.2d 73, 76 (4th Cir. 1988) (holding that precise amount of loss for restitution purposes

---

[24]     *See supra* note 22.

must be legally determined in the underlying criminal proceeding); *United States v. Johnson*, 700 F.2d 699, 701 (11th Cir. 1983) ("The amount of restitution cannot exceed the actual losses flowing from the offense for which the defendant had been convicted."). The restitution order in this case did not exceed those bounds and, therefore, does not constitute "manifest injustice."

**2**

MIA also claims that the restitution order should be reduced by the amount of money MIA paid to settle a civil class action suit alleging "the same form of conspiracy for which Mannesmann was convicted in this case."[25] We disagree.

While a court may offset restitution in a criminal case by the amount of a civil settlement to avoid double recovery by victims, the availability of such an offset

> depends upon what payment was made in the settlement, whether the claims settled involved the same acts of the defendants as those that are predicates of their criminal convictions, and whether the payment satisfies the penal purposes the district court sought to impose.

*United States v. Rico Industries, Inc.*, 854 F.2d 710, 715 (5th Cir. 1988), cert. denied, 489 U.S. 1078, 109 S. Ct. 1529 (1989). In the civil case, plaintiffs alleged a 20-year price fixing conspiracy beginning in 1966, that affected hundreds of projects, fabricators, engineering companies, and end users.[26] The criminal case at issue concerns a four-year bid rigging

---

[25]    MIA Brief at 28.

[26]    Record Excerpts at tab 33.

-26-

conspiracy involving sales made through a single fabricator, TPB.

Only two of the 28 defendants named in the civil suit--MIA and

Guyon--were involved in the criminal conspiracy.  Most

importantly, in settling its civil case, MIA paid a total of

$814,000 to a significantly broader class of victims for a

significantly broader number of projects, and MIA has offered no

accounting to show how the victims of its criminal conspiracy

received restitution through that civil conspiracy settlement.[27]

Accordingly, we find no reason to diminish the amount of the

district court's restitution order.

**3**

Finally, MIA asserts that, since its involvement in the

conspiracy was limited, the district court's award of joint

restitution is patently unfair to MIA.  Specifically, MIA argues

that:

> [i]f MIA were a major player in the conspiracy, it
> would have been involved in a larger share of the
> number of allegedly rigged inquiries.  The government
> introduced evidence of bids on 72 different projects.
> MIA submitted a total of eleven (11) bids on all of the
> projects.  The 72 projects ultimately became jobs.  The
> evidence at trial indicated that MIA participated in
> only eight total jobs. . . .  In short, the government
> attempts to place responsibility on MIA's shoulder's
> for a volume of commerce that exceeded $5,000,000.  The
> projects for which MIA allegedly sold pipe had a total

---

[27]     MIA's civil settlement does not limit MIA's payments to victims injured by bid rigging in this criminal case; rather, that settlement extends to all purchasers of specialty steel piping material in the United States who purchased under cost-plus contracts between 1966 and 1985 from numerous fabricators in addition to TPB. Record Excerpts at tab 34, pp. 3-4; MIA Brief at 28.

of just $1,842,693 in volume of commerce allegedly affected by the conspiracy.[28]

MIA's assertion is based on the claim that, while it is financially able to pay and the other defendants are not, the other defendants' culpability is demonstrably greater.

The government charged, and the jury found, that defendants engaged in a single, continuing conspiracy to rig bids on certain cost-plus contracts between 1981 and 1984. It is well-established that, as a participant in this conspiracy, MIA is legally liable for all the acts of its coconspirators in furtherance of this crime. *See United States v. Kissel*, 218 U.S. 601, 608, 31 S. Ct. 124, 126 (1910) ("[T]he conspiracy continues up to the time of abandonment or success.") ("A conspiracy is a partnership in criminal purposes . . . [and] an overt act of one partner may be the act of all without any new agreement specifically directed to that act."); *see also Hyde v. United States*, 225 U.S. 347, 369, 32 S. Ct. 793, 803 (1912) (the liability of an individual conspirator continues until the conspiracy accomplishes its goals or that conspirator withdraws, the latter of which requires an affirmative action). Accordingly, the district court did not abuse its discretion in holding MIA jointly and severally liable for all losses to the victims of the four-year conspiracy proved at trial. *See United States v. Haile*, 795 F.2d 489, 491 (5th Cir. 1986) (Section 3651

---

[28]   MIA Reply Brief of Defendants-Appellants Mannesman International Alloys, Inc. and Richard A. Brazzale at 10, *United States v. All Star Industries, Inc.*, No. 91-2439 (5th Cir. filed Dec. 13, 1991) (citations and footnotes omitted).

of the Probation Act "gives broad authority to district courts to impose conditions of probation that in the judgment of the sentencing judge serve to rehabilitate the criminal or secure compliance with court orders, and otherwise are in the public interest.") (holding, however, that Probation Act precludes monetary penalties other than those enumerated in the statute); *United States v. Van Cauwenberghe*, 827 F.2d 424, 435 (9th Cir. 1987) (holding that joint and several liability for entire actual loss could have been imposed on each fraud defendant as condition of probation), *cert. denied*, 484 U.S. 1042, 108 S. Ct. 773 (1988); *United States v. Tzakis*, 736 F.2d 867, 871 (2d Cir. 1984) (holding that district court did not abuse its discretion by imposing on defendant, as condition of probation, joint and several liability with codefendant for restitution of full amount of losses caused by their crime); *see also United States v. Hand*, 863 F.2d 1100, 1106 (3d Cir. 1988) (Holding that, in ordering restitution under the Victim & Witness Protection Act, the fact that burden of restitution lay entirely on one defendant where two codefendants were equally culpable did not offend Constitution and "certainly . . . did not constitute an abuse of discretion.").

## III

For the foregoing reasons, we AFFIRM.